WILLIAM GRANT & SONS LIMITED and William Grant & Sons, Inc., Plaintiffs,

v.

EUROPEAN BEVERAGES CO. INC. and William Cadenhead Limited, Defendants.

No. CV 85–8110–ER.

United States District Court, C.D. California.

Aug. 31, 1987.

---

Paul F. Kilmer and Lisa Mariorenzie-Muso, Mason, Fenwick & Lawrence, Washington, D.C., Reed M. Williams, Graham & James, Long Beach, Cal., for plaintiffs.

Breidenbach, Swainston, Crispo & Way, Los Angeles, Cal., James L. Kurtz, Washington, D.C., for defendants.

RAFEEDIE, District Judge.

According to an old adage, "Providence, having given Scotland a bad climate, bestowed on her, by way of compensation, a superlatively good whisky." Sir Robert Lockhart, *Scotch: The Whisky of Scotland in Fact and Story*, 169 (8th ed. 1981). This case involves a dispute between the producers of two of those superlatively good whiskies.

Plaintiff William Grant & Sons Ltd, ("Grant Scotland") owns and operates The Glenfiddich Distillery and The Balvenie Distillery both of which are located in Dufftown Scotland.[1] Grant Scotland has distilled whisky at these two distilleries since the late 19th Century and has exported whisky from these distilleries since as early as 1909.[2] Grant Scotland is the owner of all right, title and interest in and to United States Patent and Trademark Office Trademark Registration Numbers 742,087 and 949,472 for the GLENFIDDICH mark and Number 888,377 for the BALVANIE mark. Plaintiff William Grant & Sons, Inc. ("Grant USA") is the wholly owned U.S. subsidiary of Grant Scotland which imports Grant Scotland's Glenfiddich and Balvenie whiskies. Defendant William Cadenhead Ltd. ("Cadenhead") is a Scottish corporation which is now a subsidiary of J & A Mitchell & Co. Ltd. Cadenhead has marketed Scotch whisky in this country which was originally distilled at the Glenfiddich and Balvenie Distilleries. Defendant European Beverages Co. is a California corporation which imported and sold the whisky produced and marketed by Cadenhead.

The parties have previously agreed that the Scotch whiskies marketed and sold by defendants which are the subject of this litigation infringed upon plaintiff's registered marks. They entered into a stipulation resolving all issues in this case *except* for the form of the injunction to be issued. Plaintiffs contend that defendants should be precluded from making any mention of the fact that its whiskies were originally distilled at the Glenfiddich and Balvenie distilleries. Defendants maintain that they should be able to freely put such information on the labels of its bottles as long as the terms "Glenfiddich" or "Balvenie" are not emphasized in size or color and as long as the label discloses that the whisky was rebottled by defendant. The parties submitted briefs in support of their position as well as proposed injunctions and labels. After considering the papers and pleading on file and the applicable law, this Court was not satisfied with either parties' submission. Consequently, the Court held a telephonic hearing with counsel informing them of the Court's tentative view on the matter and hearing argument from both sides. During that conference the Court made it clear that it felt defendants could make a limited use of the Glenfiddich or Balvenie Distillery names on the labels of its bottles as long as it was not exploitive and there was an appropriate disclaimer. The Court allowed counsel five days to respond to the Court's tentative conclusion on this issue. Both parties have submitted proposals. The Court has considered these suggestions and concludes that its original solution to this matter is the best course to follow. In order to better understand the Court's ruling, however, it is necessary to review the process utilized to make scotch whisky, and the relationship between the parties to this action.

## THE PRODUCTION OF SCOTCH WHISKEY

The word whisky comes from the Gaelic *uisge-beatha* which means the "water of

---

1. According to Sir Lockhart, Dufftown claims, with justice, "to have more distilleries per head of population than any other town in the world." *Scotch*, 29.

2. Plaintiffs' products have long been recognized as premier "pure malt" whiskies. Sir Lockhart quotes the following homage to the Grant family:

> Lord grant guid luck tae a' the Grants,
> Likewise eternal bliss,
> For they should sit among the sa'nts,
> That make a dram like this.

*Scotch*, 31.

life." There are many types of whisky produced in the world today, but it is the finest type of whisky which forms the basis of this lawsuit—"single malt," "unblended," or "pure malt" Scotch whisky. Malt whiskies are distilled in Scotland and produced from a "mash" consisting exclusively and entirely of malted barley. The exclusive use of malted barley gives Scotch pure malt whisky "a more distinctive flavour than all other whiskies...." *Scotch,* 3.[3]

Malted barley is one of the four essential ingredients of a Scotch whisky, and is produced by germinating the barley to a certain degree, and then drying the barley so as to create soluble starch, sugars, and enzymes which act to convert starch to sugar. After malting, the barley is transformed into a sweet liquid called the "wort" through a process called "mashing." First, the barley is milled, then hot water is added and, with heating, the enzymes in the malt convert the starches to sugars. The used barley husks are separated from the sweet wort which is transferred to fermentation vessels where yeast is introduced to the liquid. After fermentation the liquid is "distilled" into a malt whisky.

"Distillation means to 'extract the essence of' and the essence is never the same." *Scotch,* 5. The original distillate "emerges from the spirit-still as clear as gin, [and] has to be matured in order to rid it of impurities and to improve its flavor." *Id.,* 39. The original distillate varies greatly in appearance, taste, and aroma from a matured Scotch whisky, and it is the maturation in oak wood casks which produces these differences.

The type of cask used affects the taste, bouquet, and color of the whisky.[4] Air coming through the pores of the casks produces chemical changes in the maturing distillate and affects the quality of the product so the distillate must be properly stored or it can pick up odor, contaminants, or other characteristics of its environment.

Only after the distillate has been matured for at least three years may it be called "Scotch whisky." Many whiskies are matured for much longer than 3 years, and the length of maturation affects the taste and other characteristics. Prior to bottling, the matured whisky is reduced with water to bottling strength.

Both parties to this litigation produce "single malt," "unblended," or "pure malt" Scotch whisky. Nonetheless, plaintiffs and defendants produce a different type of "unblended" whisky.

Defendants market a product that comes from a single cask. The characteristics of a whisky bottled from one cask may be different from whisky bottled from another cask. Plaintiffs' whisky is produced by "mixing and marrying" whisky fillings from different casks made of different wood and matured for different lengths of time. Because all of these fillings emanate from a single distillery, the whisky is still called "unblended," but plaintiff produces a product which is of a more consistent quality than defendants with regard to taste,

---

**3.** Other whiskies are produced from a mash of various mixed grains. For example, rye whisky is produced from a mixture of cereal grains containing at least 51% rye, bourbon or "corn whisky" is produced from a mix of grains containing at least 51% maize, and Scotch grain whisky is produced from a mash containing a mix of grains which is converted or "saccharified" by malted barley. Blended Scotch whiskies "which, on account of their lighter nature have found the highest favour with the urban population of the whisky-drinking world," are produced from a mixture of Scotch "malt" and "grain" whisky. *Scotch,* 4.

**4.** Thus, plaintiff uses only sherry wood casks for the storing and maturation of its Balvenie whisky. A sherry wood cask is an oak wood cask in which sherry was previously stored. Glenfiddich whisky is produced from distillate matured in casks of different ages and types. Some of these casks may be made of sherry wood, plain wood, or de-charred bourbon wood. Plain wood refers to an oak cask used for the first time to mature whisky distillate. Bourbon wood refers to a cask that was previously used to mature bourbon. Sir Lockhart remarks that "The choice of cask is therefore all-important, and the best is an oak sherry cask. It was, in fact, the sherry in the wood which gave the malt whisky its rich amber colour ... The genius who first discovered that whisky improved in wood remains, I think unknown." *Scotch,* 39–40.

bouquet, and color. Each bottle of Glenfiddich is consistent within a narrow range of flavour, smell, and appearance; whereas the taste and other characteristics of defendants' products may vary greatly from cask to cask.

The genesis of the dispute in this matter lies in the fact that plaintiffs have sold original distillate or "new fillings" produced at its distilleries to third parties and whisky brokers since the time that its distilleries were built. These third parties generally use the "new fillings" to produce blended Scotch whiskies. Most of the more popular Scotch whiskies sold in this country such as Dewars White Label are blended whiskies. "... [B]lending to-day has become a fine art, for whiskies are like the breeding of a pedigree stock. They cannot be crossed indiscriminately." *Scotch*, 89.

Until 1984, plaintiffs sold casks of unblended "new fillings" that had been distilled at either the Glenfiddich or Balvenie Distilleries. In 1984, plaintiffs discontinued this practice and began selling casks of blended "new fillings" to third parties. These casks carry new tradenames and are not identified with the Glenfiddich or Balvenie names.

Defendants own numerous casks of unblended "new fillings" originally distilled in various years at the Glenfiddich and Balvenie distilleries. The new fillings purchased prior to 1972 are contained in casks supplied by Grant Scotland. The new fillings purchased after 1972 are contained in casks supplied by Cadenhead or its related companies. Although Cadenhead has used some of these new fillings to produce blended whiskies, it has also used the matured whisky to produce an unblended whisky from a single cask. These unblended whiskies previously carried labels identifying them as "Glenfiddich," "Glenfiddich-Glenlivet," and "Balveni-Glenlivet." [5] Cadenhead has conceded that these labels infringed upon plaintiffs' registered marks, and Cadenhead now seeks to market these same whiskies using different labels.

Before bottling the distillate it purchased from plaintiffs, Cadenhead matures the whisky in the oak casks. Prior to bottling Cadenhead dilutes the raw whisky with water from Crosshill Loch, adjusts the whisky to exact bottling strength, and then filters the product before bottling.[6] Cadenhead, unlike Grant Scotland, does not "chill filter" its whisky which is a process used to prevent the possible formation of "hairy mould" in the bottle. "Hairy mould" is a slight clouding that can occur if the whisky is allowed to get cold.[7] Cadenhed asserts that chill filtering removes elements of flavour and aroma from the whisky. Ca-

5. Defendants' use of the term "Glenlivet" recalls an earlier interesting, but legally irrelevant dispute concerning the alleged improper use of a distillery name on pure malt whisky. Sir Lockhart states:

> By 1850 Glenlivet whisky had already acquired a foremost name in the then comparatively restricted market for the product. Other distilleries, which sprang up later in Speyside, but not in the glen watered by the Livet, sought to enhance the value of their own whisky by giving it the name of Glenlivet. Such was the wise abuse of the name that Glenlivet became known sarcastically as the longest glen in Scotland.... Had Glenlivet whisky to be made in the glen in order to justify the title of Glenlivet or could any distillery in the neighbourhood usurp the name? Mr. Smith won a partial victory. The court decided that only Glenlivet Distillery was entitled to label its whisky 'Glenlivet' without qualification. Other distillers, however, were free to hyphenate Glenlivet with their own name. Many of them ... did so, but the practice has now ceased.

*Scotch*, 25.

6. Plaintiff dilutes its whisky with water from the Robbie Dubh Burn which is filtered and consistent within a narrow range of mineral and chemical composition. Water from the publicly maintained Crosshill Loch is neither filtered nor treated. These differences can affect the taste of the finished whisky.

7. Thus, it is possible that Cadenhead's whiskies would become slightly cloudy when they encounter ice in a glass. Hedley Gordon Wright, the Chairman of Cadenhead testified that he would not put ice in a malt whisky, but would only drink it straight. Sir Lockhart explains, "It is permissible to drink a little water with the whisky, but preferably after it. Soda water is an abomination and degrades both the spirit and the soul. By and large, the connoisseur abides by the Old Highland saying: 'There are two things a Highlander likes naked, and one is malt whisky.'" *Scotch*, p. 15.

denhead also bottles its single malt Scotch whiskies at a greater strength than Grant Scotland.

There is no dispute between the parties that their respective whiskies differ in flavor, bouquet, color and composition. Defendants' whisky is *not* the same as plaintiffs' Glenfiddich even though the distillate was produced at the Glenfiddich Distillery. The issue is whether defendants may inform customers that its product was initially distilled at The Glenfiddich Distillery and bottled by defendants.

Defendants contend that such a label should be acceptable based upon the holding in *Prestonettes Inc. v. De Sporturno Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). In *Coty,* the plaintiff purchased toilet powder and perfume which was protected by trademarks. Plaintiff applied pressure to the powder, added its own binder, and sold it in a metal compact under the trademarked Coty name. The Supreme Court held that the plaintiff could use the Coty name on the label as long as the label also stated that the plaintiff was not connected with Coty, and independently rebottled the Coty product with its own binder.

Defendant maintains that this case is the same as *Coty,* relying upon the following language:

If the name "Coty" were allowed to be printed in different letters from the rest of the inscription dictated by the district court, a casual purchaser might look no further and might be deceived. But when it in no way stands out from the statement of facts that unquestionably the defendant has a right to communicate in some form, we see no reason why it should not be used collaterally, not to indicate the goods, but to say that the trademarked product is a constituent in the article now offered as new and changed. As a general proposition there can be no doubt that the word might be so used. If a man bought a barrel of a certain flour, or a demijohn of Old Crow whisky, he certainly could sell the flour in smaller packages, or in former days, could have sold the whisky in bottles,

and tell what it was, if he stated that he did the dividing up or the bottling.

264 U.S. at 369, 44 S.Ct. at 351, 68 L.Ed. at 742.

The facts of this case are not the same as those in *Coty.* Contrary to defendants' contention, Cadenhead does not merely rebottle "genuine Glenfiddich and Balvenie Scotch whisky." Instead, the whisky bottled by defendants is different in taste, smell, and color from Glenfiddich and Balvenie despite the fact that it was distilled at The Glenfiddich and Balvenie Distilleries. These differences are caused by the different procedures used by the parties in producing their respective pure malt Scotch whiskies. Thus, unlike the man who bottled a demijohn of Old Crow whisky in the *Coty* case, the defendant does not merely rebottle the same whisky that is sold as Glenfiddich or Balvenie. One who bottled a demijohn of Old Crow, in addition to violating the Volstead Act (which Sir Lockhart calls "the most puzzling episode in American history," *Scotch,* 143), would have bottled a product that tasted like any other bottle of Old Crow, and was, in fact, Old Crow whisky. It is without dispute that Cadenhead's products are very different from those produced by Grant Scotland.

Consequently, a label which merely states that defendants' product was distilled at the Glenfiddich or Balvenie Distillery and bottled by defendant would be confusing and misleading to most customers.

Plaintiffs contend, on the other hand, that there can be *no use* of the Glenfiddich or Balvenie name on defendants' labels arguing that consumers would be confused by any such reference. Plaintiffs offer that it would be appropriate to allow defendants to state on its labels that the whisky was distilled by William Grant & Sons. Plaintiffs suggest that the following statement be contained on the labels:

William Cadenhead Ltd., an independent bottler not connected with the distiller, has bottled this product from a cask of spirits originally distilled by William Grant & Sons Ltd. This product is not

the same as the bottled products sold by the distiller. The characteristics of a single malt whisky are qualitatively different depending on cask selection, maturation and the bottling process used by the bottler. *This whisky is not bottled under the supervision of the distiller and the distiller is not responsible for the quality of the contents.*

Although the Court agrees with plaintiffs that defendants' proposed label does not sufficiently guard against the likelihood of consumer confusion, the Court does not agree that defendants should be enjoined from truthfully stating that its product was bottled from a cask of spirits originally distilled at The Glenfiddich Distillery as long as the label contains an appropriate disclaimer stating that defendants' products are not the same as plaintiffs' products and are not bottled under the supervision of plaintiffs. Plaintiffs contend that allowing defendants to use the tradename "William Grant & Sons Ltd." instead of the distillery name will satisfy any desire defendants have to make a true statement about the source of the distillate used in its whisky. But such a statement would be equally misleading to consumers. The Court believes that defendants should be allowed to inform their customers where the spirits were distilled.[8]

Although the facts of this case differ from the facts of *Coty*, there are principals of law ennunciated by *Coty* which support this view.

As Justice Holmes stated:

The defendant of course by virtue of its ownership had a right to compound or change what it bought, to divide either the original or the modified product, and to sell it so divided. The plaintiff could not prevent or complain of its stating the nature of the component parts and the source from which they were derived if it did not use the trade mark in doing so. For instance, the defendant could state that a certain percentage of its compound was made at a certain place in Paris, however well known as the plaintiff's factory that place might be. If the compound was worse than the constituent, it might be a misfortune to the plaintiff, but the plaintiff would have no cause of action, as the defendant was exercising the rights of ownership and only telling the truth. The existence of a trade mark would have no bearing on the question. Then what new rights does the trade mark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright. The argument drawn from the language of the Trade Mark Act does not seem to us to need discussion. A trade mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 [39 S.Ct. 48, 50, 63 L.Ed. 141]. There is nothing to the contrary in *Bourjois & Co. v. Katzel*, 260 U.S. 689 [43 S.Ct. 244, 67 L.Ed. 464]. There the trade mark protected indicated that the goods came from the plaintiff in the United States, although not made by it, and therefore could not be put upon other goods of the same make coming from abroad. When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.

*Canal Co. v. Clark*, 13 Wall. 311, 327, 20 L.Ed. 581, 264 U.S. at 368, 44 S.Ct. at 351.

Under separate cover, the Court will issue an injunction consistent with its determination that defendants should be allowed to truthfully state the source of the spirits used in its whisky. The following information should be contained on any label by

---

8. There is a distinction between spirits distilled at the Glenfiddich or Balvenie Distilleries. In fact spirits distilled prior to 1972 were sold in casks supplied by the plaintiffs. Based upon the information before the Court, it would appear that Balvenie spirits sold prior to 1972 were contained solely in sherry wood casks, whereas Glenfiddich spirits could be contained in other cask types. The Court will take judicial notice of the response of its own palate, and submits that there are other differences between the whiskies distilled at The Glenfiddich and Balvenie Distilleries. Defendants should be allowed inform customers of the actual source of its whisky and not just the general corporate source.

which defendants identify The Glenfiddich or Balvenie Distilleries:

> William Cadenhead Ltd., an independent bottler not associated with the distiller, has bottled this product from a cask of spirits originally distilled at the Glenfiddich [or Balvenie] Distillery. This product is not the same as the bottled products sold by the distiller, nor is it bottled under the supervision of the distiller and the distiller is not responsible for this product.

This is essentially the same language proposed by the Court at the telephonic status conference.[9]

Defendants submitted a label which altered the Court's proposal in form and language and is not acceptable. Defendants may not emphasize any part of the above language with larger typeface or different lettering or coloring. The use of the term "The Glenfiddich [or Balvenie] Distillery" should "in no way stand out from" the other language, and the entire statement should be "in letters of the same size, color, type, and general distinctiveness." *Coty*, 264 U.S. at 367, 44 S.Ct. at 351, 68 L.Ed. at 741. Moreover, the label should contain the foregoing language in the format and order laid out above.

Although defendants have expressed concern about the appearance of the labels, the Court is more concerned that any label using the names of plaintiffs' distilleries does not emphasize those names, and that the labels contain the appropriate disclaimer. Defendants are allowed to use the distillery names within the guidelines established by the Court. If they desire a more attractive label, or one without the disclaimers, they should not use the distillery names. Otherwise let the water of life flow. As Sir Lockhart summed up:

> "In March, 1951, two of the leading doctors of the United States declared pontifically that a man is a fool not to drink after forty and should take three ounces of whisky daily to counteract the effects of hardening of the arteries. So, with the best medical opinion on his side,

what is the poor Scot to do? This, I think, is the conclusion of the whole matter. As a friend, whisky has virtues unequalled by any other form of alcohol. As O. Henry wrote in *The Lost Blend*, 'it gives new courage and ambition and the nerve for anything. It has the colour of gold, is clear as glass and shines after dark as if the sunshine were still in it.' " *Scotch*, 163.

IT IS SO ORDERED.

The Court further orders the Clerk to serve copies of this Order on all parties by United States mail.

---

**9.** The sole difference is the substitution of the word "spirits" for the word "whisky" in the first sentence. The Court believes the former term is more appropriate given the evidence before it.